UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                        CASE NO. 8:12-CR- 157/30 EAJ

JOSE PASCUAL                                  18 U.S.C. § 1349
                                                            18 U.S.C. § 982(a)(7) (forfeiture)

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud)**

Introduction

At all times material to this Information:

A.   **The Medicare Program**

1.   The Medicare Program ("Medicare") was a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provided medical benefits, items and services (collectively "services") to persons age 65 and older or with certain disabilities (hereinafter "beneficiaries"). Each Medicare beneficiary received a unique health insurance claim number ("HICN") for billing and identification purposes.

2.   Medicare coverage was divided into four separate parts. Part B of Medicare ("Medicare Part B") provided supplemental medical insurance to beneficiaries for, among other things, medically-necessary outpatient care and physical/occupational therapy services.

3. The Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services, oversaw and administered Medicare throughout the United States. CMS divided the United States into geographic regions and contracted with various companies in those regions to assist in the administration of Medicare. First Coast Service Options, Inc. ("First Coast") was responsible for administering Medicare in Florida, by virtue of its contract with CMS. In particular, First Coast was responsible for receiving, processing, and paying Medicare Part B claims that were submitted by Florida-based Medicare providers.

4. Outpatient Physical Therapy providers ("OPTs") were freestanding facilities that provided outpatient physical therapy, occupational therapy, and speech-language pathology services ("OPT services") to Medicare beneficiaries under a written plan of treatment. OPT services provided to Medicare beneficiaries were covered by Medicare Part B.

5. To become a qualified Medicare provider, an OPT first had to apply for and obtain a "Medicare Identification Number" (commonly referred to as a "provider number"), which was used for identification and billing purposes. Physicians who certified the beneficiary's need for OPT services and the licensed physical therapists who provided such services, were also assigned unique identification numbers, which consisted of the National Provider Identifiers ("NPIs") and Unique Physician Identification Number ("UPIN"), for billing and identification purposes.

6. If a Florida-based OPT with a Medicare provider number changed ownership, the new OPT owner, in order to continue participating in Medicare, was

required to submit a Form CMS-855A, Medicare Enrollment Application, to First Coast. Pursuant to the Medicare Enrollment Application, the new OPT owner was required to certify that he agreed, among other things, that he would not knowingly present or cause to be presented a false or fraudulent claim for reimbursement under Medicare.

### B. Medicare Claims Procedure

7. Payments for OPT services rendered under Medicare were often made directly to the OPT rather than to the beneficiary. For this to occur, the Medicare beneficiary would assign the right of payment to the OPT. Once such an assignment was made, the OPT would assume the responsibility for submitting Medicare claims for reimbursement and would receive those payments directly. In some cases, Florida-based OPTs used third-party billing companies to submit their Medicare claims to First Coast.

8. To seek reimbursement under Medicare, an OPT, or its third-party billing company, would submit to First Coast, a health insurance claim form (the "Medicare claim form"), either electronically or in paper format. A Medicare claim form submitted by an OPT was required to include certain information, including, but not limited to:

    (a) the Medicare beneficiary's name and HICN;

    (b) the OPT's name, address, and provider number;

    (c) the name and NPI of the physician who certified the need for the OPT services and, in some cases, the name and NPI of the therapist who personally provided those services to the Medicare beneficiary;

    (d) the date upon which the OPT services were provided to the Medicare beneficiary; and

(e) the specific type of OPT services that were provided to the Medicare beneficiary, as reflected by the Current Procedural Terminology ("CPT") code corresponding to such service. The CPT was a systematic listing and coding of medical procedures and services performed by Medicare providers, including OPTs. Each procedure or service was identified by a five-digit code. OPTs used CPT codes to certify the type of services that had been provided to the beneficiary and for which reimbursement was being sought under Medicare; First Coast, as the administrator of Medicare in Florida, used the CPT codes to determine the appropriate amount to be paid under Medicare for those services.

9. If the OPT's Medicare claim was approved, a substantial portion of the total amount of the claim was paid either by check—made payable to the OPT—or wire transfer to an account designated by the OPT.

C. **R&R Outpatient, LLC**

10. R&R Outpatient, LLC ("R&R Outpatient") was an OPT purportedly specializing in physical and occupational therapy services and doing business in two locations in the Middle District of Florida. R&R Outpatient's Medicare provider number was 68-6661.

D. **The Defendant**

11. Defendant JOSE PASCUAL, a resident of Naples, Collier County, Florida, was the self-identified owner, president, and administrator of R&R Outpatient.

## The Conspiracy

12.     From in or about January 2007, through on or about March 31, 2008, within the Middle District of Florida, and elsewhere,

### JOSE PASCUAL,

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services.

## Manner and Means of the Conspiracy

The manner and means by which JOSE PASCUAL and his co-conspirators sought to accomplish the objects of the conspiracy included, among other things:

13.     It was part of the conspiracy that JOSE PASCUAL and co-conspirator C.P. would and did agree to purchase a pre-existing OPT for purposes of submitting false and fraudulent Medicare claims for reimbursement to First Coast.

14.     It was further part of the conspiracy that JOSE PASCUAL would and did purchase R&R Outpatient, an existing OPT with a pre-assigned Medicare provider number, and, in doing so, acquired the medical records maintained by R&R Outpatient's prior owners, including the names and HICNs of Medicare beneficiaries.

15. It was further part of the conspiracy that JOSE PASCUAL would and did submit a Form CMS-855A, Medicare Enrollment Application, to First Coast, identifying himself as the new owner, officer, and administrator of R&R Outpatient, for purposes of continuing R&R Outpatient's participation in Medicare.

16. It was further part of the conspiracy that conspirators would and did open a checking account in the name of R&R Outpatient at Fifth Third Bank.

17. It was further part of the conspiracy that JOSE PASCUAL would and did employ co-conspirator O.M. as a receptionist at R&R Outpatient's Ocala office to perform various tasks, including, but not limited to, answering telephone calls, collecting Medicare reimbursement checks, and providing false and misleading information to Medicare representatives, all in an attempt to create the false appearance that R&R Outpatient was a legitimate, operational OPT, when, in fact, it was not.

18. It was further part of the conspiracy that JOSE PASCUAL would and did execute a Form CMS 855-A, Medicare Enrollment Application, adding a Fort Myers, Florida office as a new business location for R&R Outpatient.

19. It was further part of the conspiracy that JOSE PASCUAL would and did pay Medicare beneficiaries to travel from Miami-Dade County to Fort Myers to sign documents as if they were patients of R&R Outpatient, when, in fact, they were not.

20. It was further part of the conspiracy that conspirators would and did use Medicare beneficiary information to create bogus medical records supporting fraudulent Medicare claims.

21. It was further part of the conspiracy that conspirators would and did cause R&R Outpatient's third-party billing company to submit fraudulent Medicare

claims for reimbursement to First Coast.

22. Following receipt from CMS that R&R Outpatient's Medicare provider agreement had been terminated, it was further part of the conspiracy that conspirators would and did enlist the assistance of co-conspirator E.O. to serve as the new (nominee) owner of R&R Outpatient.

23. It was further part of the conspiracy that conspirators would and did deposit over $1,000,000.00 in fraudulently-obtained Medicare funds into R&R Outpatient's Fifth Third Bank account and distributed those fraud proceeds among the conspirators.

24. Following final suspension of Medicare payments to R&R Outpatient, it was further part of the conspiracy that conspirators would and did utilize other Medicare-approved OPTs (the "co-conspirator clinics"), also located in the Middle District of Florida, to submit additional fraudulent claims for Medicare reimbursement to First Coast using R&R Outpatient's bogus medical records.

25. It was further part of the conspiracy that conspirators would and did cause the transfer of more than $150,000 in fraudulently-obtained Medicare funds from the co-conspirator clinics' respective bank accounts to R&R Outpatient's Fifth Third Bank account.

26. It was further part of the conspiracy that JOSE PASCUAL and others would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purposes of, and the acts done in furtherance of, said conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## **FORFEITURES**

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

2. From his engagement in the violations alleged in Count One of this Information, punishable by imprisonment for more than one year, the defendant,

JOSE PASCUAL,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), all of his right, title, and interest in any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such violation, including, but not limited to, a forfeiture money judgment in an amount no less than $1,292,375.25, which represents the amount of proceeds obtained as a result of the offense charged in Count One of the Information, for which the defendant is jointly and severally liable with his co-conspirators.

3. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

ROBERT E. O'NEILL<br>
United States Attorney

By: _____
SIMON GAUGUSH
Assistant United States Attorney

By: _____
ROBERT MOSAKOWSKI
Assistant United States Attorney
Chief, Economic Crimes Section